UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                              Case No.: 14-34513-LMI

Ernesto Sanchez,                                    Chapter 13

      Debtor.

_____/

## NOTICE OF FILING OF 341 MEETING OF CREDITORS TRANSCRIPT

     **COMES NOW** the Debtor, Ernesto Sanchez, and files the attached transcript of the 341

Meeting of Creditors.

                            Respectfully submitted,

                            By: */s/Laila S. Gonzalez*
                            FREIRE & GONZALEZ, P.A.
                            Attorneys for Debtor(s)
                            Edward Freire, Esq. FBN: 0813771
                            ***Laila S. Gonzalez, Esq. FBN: 0975291***
                            Gianny Blanco, Esq., FBN:0078080
                            10691 N. Kendall Dr., Suite 207
                            Miami, FL 33176
                            Tel: (305) 826-1774
                            Fax: (305) 826-1794
                            courtdoc@fgbkc.com

Page 1

1          UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF FLORIDA
2

3

IN RE:                    CASE NO. 14-34513-LMI
4

   ERNESTO SANCHEZ,
5

                Debtor.
6    _____/

7

8               341 MEETING OF CREDITORS

9                  December 11, 2014

10         The above-entitled cause came on for a Section

11   341 Meeting of Creditors before ADISLEY CORTEZ-RODRIGUEZ,

12   Esquire, Attorney for the Chapter 13 Trustee in the UNITED

13   STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT

14   OF FLORIDA, at 51 SW 1st Ave., Miami, Miami-Dade County,

15   Florida on December 11, 2014, commencing at or about

16   11:30 a.m., and the following proceedings were had.

17

18

19

20

21

22

23

24         Transcribed from a digital recording by:
              Cheryl L. Jenkins, RPR, RMR
25

Page 2

1

2                        **APPEARANCES:**

3
                    **ADISLEY CORTEZ-RODRIGUEZ, Trustee**
4

5                      **SONIA AMADOR, Esquire**
                       **On behalf of the Debtor**
6

7                          **ALSO PRESENT**

8                  **OSWALDO SIERRA, INTERPRETER**

9                          - - - - - -

10

11                          **WITNESS**
    **Ernesto Sanchez**                              **Page**
12     **Examination by Ms. Cortez-Rodriguez        3**

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1              MS. CORTEZ-RODRIGUEZ:  Trustee calls Case

2    Number 14-34513, Ernesto Armando Sanchez.

3              Please raise your right hand, sir.

4              Do you swear to tell the truth, the whole

5    truth, and nothing but the truth so help you God?

6              MR. SANCHEZ:  Yes.

7    Thereupon,

8                   ERNESTO SANCHEZ,

9    having been first duly sworn, was examined and testified

10   as follows:

11                    EXAMINATION

12   BY MS. CORTEZ-RODRIGUEZ:

13        Q.    Please state your name for the record.

14        A.    Ernesto Armando Sanchez.

15              MS. CORTEZ-RODRIGUEZ:  Okay.  Let's take

16   appearances.

17              MS. AMADOR:  Sonia Amador on behalf of the

18   debtor.

19              MS. CORTEZ-RODRIGUEZ:  Let the record

20   reflect I've reviewed the debtor's driver's license and

21   Social Security card, and they match the petition.

22   BY MS. CORTEZ-RODRIGUEZ:

23        Q.    Sir, did you read and sign the petition, the

24   plan, the schedules, and statements?

25        A.    Yes.

Page 4

1          Q.    Are they based on your knowledge, and is

2     everything correct?

3          A.    Yes.

4          Q.    Did you list all of your assets, and all of

5     your debts?

6          A.    Yes.

7          Q.    Do you understand that you answered the

8     written questions under penalty of perjury, and they're

9     part of your testimony?

10         A.    Yes.

11         Q.    Have you filed for bankruptcy before?

12         A.    No.

13         Q.    Have you filed your taxes for the last four

14    years?

15         A.    Yes.

16         Q.    And are the copies of the taxes that you

17    provided to the trustee true and correct?

18         A.    Yes.

19         Q.    Are you suing, planning on suing, or have

20    the right to sue anyone to recover any money?

21         A.    No.

22         Q.    Are you obligated to pay, or do you pay any

23    child support or alimony?

24         A.    No.

25         Q.    What kind of work do you do?

Page 5

1          A.      Fish farm.

2          Q.      So do you own a fish farm?

3          A.      I do not.

4                  (Telephone ringing.)

5                  MS. CORTEZ-RODRIGUEZ:  Please turn off your

6     cell phones, folks.  Thank you.

7     BY MS. CORTEZ-RODRIGUEZ:

8          Q.      And does he pay you with a 1099?

9          A.      1040, 1040.

10         Q.      That's the tax form.

11                 So does he give you a W-2?  Does he take

12    taxes from your pay?

13         A.      I pay my own taxes at the end of the year.

14         Q.      Okay, and do you own any interest in that

15    corporation?

16         A.      Of the property itself, yes, yes.

17         Q.      So the land where the business is located,

18    that's what you own?

19         A.      Yes.

20         Q.      And what's the address of that property?

21         A.      100 Eden Lane, Lake Placid, Florida 33182.

22         Q.      Do your parents reside at that property?

23         A.      Yes.

24         Q.      Who pays for the mortgage on that property?

25                 INTERPRETER:  I'm sorry?

Page 6

1    BY MS. CORTEZ-RODRIGUEZ:

2          Q.    Who pays for the mortgage on that property?

3          A.    Before the payments were stopped, I was

4    making the payments myself for four years.  I have not

5    paid the mortgage payments on that property.

6          Q.    Are you keeping that property, or

7    surrendering that property?

8          A.    Yes, I would like to keep the property.

9          Q.    But you're not current on the mortgage?

10         A.    I'm not.

11         Q.    And that property is not included in the

12    bankruptcy, or --

13                MS. AMADOR:  It is.  It's the only --

14                MS. CORTEZ-RODRIGUEZ:  Oh, it's the

15    property, it's going to be stripped down?

16                MS. AMADOR:  Yeah.

17                MS. CORTEZ-RODRIGUEZ:  I see.

18    BY MS. CORTEZ-RODRIGUEZ:

19         Q.    So who is going to make the payments on the

20    strip down?

21         A.    Me.

22         Q.    But you're not renting the property?

23         A.    No.

24                MS. CORTEZ-RODRIGUEZ:  So the trustee is

25    going to object to him keeping a property with no rental

Page 7

1    income, okay?

2                    MS. AMADOR:  And the bank just objected, but

3    that was expected, on the appraisal, so we're going to

4    take appraisals for that, and see if we can get a rental

5    agreement.

6                    His son is the one that owns the fish farm

7    there.

8                    So she's going to need rental income on the

9    property.

10                   MS. CORTEZ-RODRIGUEZ:  Yes, because he says

11   he doesn't own the fish farm, he's just an employee.

12                   MS. AMADOR:  So he's going to have to

13   collect rent, and reflect it on the schedules.

14                   MS. CORTEZ-RODRIGUEZ:  The property would

15   have to pay for itself.

16                   MS. AMADOR:  Yep.  Okay.  Thank you.

17   BY MS. CORTEZ-RODRIGUEZ:

18           Q.    So do you live in Lake Placid, sir?

19           A.    No.

20           Q.    So how is it that you work for your son, and

21   the business is in Lake Placid?

22           A.    Because we were together, I work with him

23   over there.  I have my homestead exemption here in Miami.

24   I am the majority of the time with my parents, and I have

25   a brother of mine who works in Hialeah, and he's helping

Page 8

1    us out, and that's the business we have there of fish and

2    that (inaudible) my son provides to me part of the

3    payment, and my parents pay for the other part, and I also

4    pay for the other part.

5            Q.    So you live at the property at 100 Eden

6    Lane?

7            A.    Yes, the majority of the time I stay there.

8            Q.    So how long -- how much time would you say

9    you spend in that property?

10           A.    Monthly?

11           Q.    A year.

12           A.    I stay there 80 percent of the time, over

13    there, maybe 90 percent, because the fish require a lot of

14    attention and detail.

15           Q.    And who pays for the property in Miami,

16    Florida?

17           A.    I make the payments on the property in

18    Miami, Florida myself.

19           Q.    And who lives in that property?

20           A.    My wife, my son, and myself, and my

21    daughter, my girl.  My family moves from one place to

22    another, as well as my parents, they do spend time in both

23    places as well.

24           Q.    Did you put any money towards this fish farm

25    business?

Page 9

1          A.    Yes, of course.

2          Q.    How much did you invest?

3          A.    I invested an average of about $30,000

4    during the years 2006 or 2008.

5          Q.    And you don't own any interest in the

6    business, even though you invested $30,000?

7          A.    Not at this time, because I decided before

8    the fish business, when the crisis came about, my son

9    reacquired the business back then.

10          Q.    And when was "back than", when did that

11    happen?

12          A.    That was approximately about two years ago.

13          Q.    And when you gave him your business, did he

14    give you anything in return for that?

15          A.    No, no, because the ponds that are on the

16    property are in pretty bad shape.

17          Q.    And what does that mean?

18          A.    Those ponds where the fish are are tied

19    together with wooden posts, and the wood becomes damaged

20    with the humidity.

21          Q.    So are you saying that when you transferred

22    the business, the business wasn't worth anything?

23          A.    It's not really --

24          MS. CORTEZ-RODRIGUEZ:  This property was

25    being (inaudible) --

Page 10

```
 1              MS. AMADOR:  Yes, exactly.  So, I mean, we
 2    can talk to you about it, because now I'm -- based on his
 3    testimony, you know, there might need to be some changes
 4    made, but since there is no unsecureds, I don't --
 5              THE WITNESS:  It's really not worth much at
 6    all.
 7    BY MS. CORTEZ-RODRIGUEZ:
 8         Q.   And what would you estimate was the value of
 9    the business when you transferred it to your son?
10         A.   It could not be sold, and the establishment,
11    or the (inaudible) and the places that you supply them
12    were in pretty bad shape, so I cannot really say, I don't
13    have any idea.
14              MS. CORTEZ-RODRIGUEZ:  So, I think we'll
15    need a profit and loss for the business, as well as the
16    bank statements, okay?
17    BY MS. CORTEZ-RODRIGUEZ:
18         Q.   And now that -- at the time of filing, what
19    do you think the business was worth?
20         A.   I think that -- you're talking about the
21    value of the property?
22         Q.   No, of your business, of the fish, of the
23    ponds, everything the business owns.
24         A.   Maybe 100,000.  Right now the fish and the
25    economy has increased.
```

1        Q.    So from two years ago, when the business was

2  worth virtually nothing, the equity in the business has

3  gone up to $100,000, is that what you're saying, is that

4  your testimony?

5        A.    Because before nobody was buying fish, and

6  all the ponds were empty.  I was not able to spend food

7  (sic) on the fish, I was not able to spend electricity in

8  trying to create something that I was not going to be able

9  to sell.

10       Q.    So then that is correct, in two years the

11  business rose in equity to $100,000?

12       A.    Because the companies are again, buying fish

13  again, and they're making orders for fish, and there are

14  projects with different companies that will allow us to

15  provide fish to them.

16       Q.    How is your salary determined in that

17  business?

18       A.    It depends upon the sales that are done.  I

19  would say it's 5, 6 or $7,000 a month.

20       Q.    So it would be based on 10 percent of sales,

21  50 percent of sales?

22       A.    I feel that there must be 60 or 70 percent

23  of the sales, I'm not really sure at this time because I

24  was not prepared for that.

25       Q.    So when you agreed to work for your son, you

Page 12

1    agreed to work for whatever the sales would be?

2         A.    Yes, we made an oral agreement that I was

3    going to work with the fish, and he was going to

4    structure, and do everything regarding the, how do you say

5    it, the sales, and I was going to earn that profit myself.

6         Q.    How long have you been working for your son?

7         A.    Approximately about two years, something

8    like that.

9         Q.    So two years ago you transferred the

10   business to your son, but you stayed working for him?

11        A.    And I kept on working.

12        Q.    So you're telling me there was no equity,

13   and there was no sales, but you continued to work in the

14   same business?

15        A.    I gave my end to my son, because I did not

16   find a way to sell fish, and the fish were staying in the

17   ponds.

18        Q.    I understand that, but what I'm trying to

19   understand is this, even though you say it had no equity,

20   and you had no business with the fish industry, you have

21   always worked in that business and nothing has changed.

22   You worked there before, and you work there now, and in

23   the same capacity?

24        A.    However I was also doing electrical jobs

25   besides that (inaudible) --

Page 13

1          Q.    And now you don't to do that anymore?

2          A.    Right now, no.

3          Q.    Only the fish?

4          A.    Only the fish.

5                MS. CORTEZ-RODRIGUEZ:  Okay.  All right.

6    Thank you.

7                MR. SANCHEZ:  You're welcome.

8                INTERPRETER:  Thank you.

9

10

11

12

13                (Thereupon, the 341 Meeting of Creditors was

14   concluded.)

15

16

17

18

19

20

21

22

23

24

25

Page 14

1

2                              CERTIFICATION

3

4    STATE OF FLORIDA        :

5    COUNTY OF MIAMI-DADE   :

6

7                I, Cheryl L. Jenkins, RPR, RMR, Shorthand

8    Reporter and Notary Public in and for the State of Florida

9    at Large, do hereby certify that the foregoing Section 341

10   Meeting of Creditors was transcribed by me from a digital

11   recording made on the date and at the place as stated in

12   the caption hereto on page 1; that the foregoing

13   computer-aided transcription is a true record to the best

14   of my ability of said proceedings.

15                WITNESS my hand this 21st day of

16   December, 2019.

17

18

19            _____

20            CHERYL L. JENKINS, RPR, RMR

21            Court Reporter and Notary Public
             in and for the State of Florida at Large
22            Commission #GG 138863
             December 27, 2021

23

24

25